MATTHEW A. COSGROVE *et al. vs.* ROBERT A. FRANKLIN *et al.*
Commrs. *et al.*

JULY 11, 1913.

PRESENT:   Johnson, C. J., Parkhurst, Sweetland, and Vincent, JJ.

*(1)   Evidence.*

In an action to recover damages to property caused by the building of the approaches of a bridge, in reply to a question: "How was the house damaged

by the building of the approaches to that bridge," an answer showing injury to trees and injury by cinders from a smokestack, without identifying the smokestack, and in addition stating hearsay evidence, is not responsive, and should have been stricken out.

*(2)   Evidence.*

In an action to recover damages to property caused by the building of the approaches of a bridge, in reply to question: "Any further damage done to the house as a result of the building of the approaches," an answer showing damage from a dynamite explosion without indicating the source of the explosion, should have been stricken out.

*(3)   Evidence.*

In an action to recover damages to property caused by the building of the approaches of a bridge, testimony as to the amount of land condemned in eminent domain proceedings was properly admitted although plaintiffs had lost their right to damages for the land condemned in connection with the building of the bridge by not asserting their right within the time prescribed by statute, since such land would be necessarily removed from consideration in the case at bar so far as damage to it was concerned, and such evidence would show what remained for consideration as to damage from the building of the approaches.

*(4)   Evidence.*

In an action to recover damages to property caused by the building of the approaches of a bridge, when plaintiff had lost his right to damages for the land condemned in connection with the building of the bridge by failure to assert his right within the time prescribed by statute, testimony as to the use made by a tenant of a portion of the land which he rented, for the purpose of showing that by reason of the cutting off of such land the rental value had decreased, was immaterial since petitioner could not show damage to the property caused by the cutting off of such land, in this proceeding.

*(5)   Evidence.   Eminent Domain.*

In an action to recover damages to property caused by the building of the approaches of a bridge, evidence of damage by reason of condemnation proceedings cannot be considered.

*(6)   Evidence.   Best Evidence.*

Question as to whether father of witness ever sold any portion of certain premises is objectionable since the deed would be the best evidence of such fact.

*(7)   Evidence.*

In an action to recover damages to property caused by the building of the approaches of a bridge, question whether a portion of the land sold to X by the father of witness was included in the premises for which the action was brought was admissible, for while the deed would be the best evidence as to the description of the land conveyed, it might require the evidence of a witness to show that the portion conveyed was not included in the description of the land in the pending case.

*(8)   Evidence.*

In an action to recover damages to property caused by the building of the approaches of a bridge, evidence of real estate dealers as to the value of the

land or house at the time of trial or after the building of the approach is pertinent for the purpose of ascertaining the present value for comparison with the value before the building of the approach.

*(9)   Evidence.*

Upon the question of ownership of premises, evidence of a tax collector as to whom the premises had been taxed for a stated period was admissible, for while not tending to prove either title or possession it constituted one circumstance, which in connection with others, might be considered by the jury.

*(10)   Hearsay Evidence.*

The admission of hearsay evidence which is not harmful does not constitute reversible error.

*(11)   Evidence.   Plats.*

In an action to recover damages to property caused by the building of the approaches of a bridge, a plat showing land condemned by the commissioners was properly admitted since such land would be removed from consideration in the case at bar, so far as damage to it was concerned, and such evidence would show what remained for consideration, as to damage from the building of the approaches.

*(12)   Land Damage.*

In an action to recover damages to property caused by the building of the approaches of a bridge, charge that if deterioration in value by the construction of the approach was found, then the difference between its value before the approach was built and its value after the construction was the amount to be awarded claimant, was error, since its value might have deteriorated from causes other than such construction.

*(13)   Land Damage.*

Cap. 499, Pub. Laws, as amended by cap. 649, Pub. Laws, "An act for the appointment of a commission for the erection of a certain bridge between the cities of Pawtucket and Central Falls," Sec. 4, gave the commissioners power to condemn land, buildings and improvements for the purposes of the bridge, its abutments and approaches and provided for the appraisal of damages caused by such condemnation.   Section 5 provided that any person having an interest in land abutting upon the approaches might petition for the assessment of damages suffered through the building of the approaches. Under Sec. 4 the commissioners condemned a part of the house occupied by petitioner and the land on which such part stood.

Petitioner brought his petition for compensation for damages caused to him as an abutting owner through the building of the approaches.

*Held,* that the cutting off of a portion of the house, which stood upon the land condemned, although done on the building of the approaches was an injury for which petitioner could have been compensated under Sec. 4, since just compensation in such case would have included not only the value of that which was taken, but damages if any to the remainder, and therefore instruction to the jury that if upon the construction of the approaches it became necessary to cut the building and by reason thereof there was damage to the

34

remaining portion abutting upon the approach, that constituted an element of damage in the proceedings under Sec. 5, was erroneous.

*(14)   Adverse Possession.*

If a tenant after the expiration of a lease executed by lessor disclaimed lessor's title and claiming to be the owner in fee simple of the premises made his claim in such manner as to carry knowledge of it home to lessor or his successors in the title, and thereafter remained in uninterrupted quiet and peaceful and actual seisin and possession of the premises during the period of ten years after February 1, 1896, claiming all that time to be the sole and rightful owner in fee simple, he acquired title by adverse possession.

*(15)   Adverse Possession.   Landlord and Tenant.*

Charge that if claimant would establish title by adverse possession he must show that possession of his ancestor in title continued for the statutory period after the expiration of the lease, but he was estopped to set up that lessor did not have title upon the execution of the lease to the ancestor in title of claimant, was proper.

*(16)   Land Damage.*

In an action to recover damage to property caused by the building of the approaches of a bridge, instruction that when the owner of the premises had notice that the building must be moved, he could not permit damage to be done to it if the conditions were such that he might reasonably be expected to move it and thus reduce the damage which he otherwise would suffer, and if he should have taken steps to prevent the cutting of the building then such damage as was suffered by reason of the cutting would not be an element of damage in the case, was proper.

PETITION under Pub. Laws, cap. 499, as amended by cap. 649, to recover damages.   Heard on exceptions of respondents and sustained.

JOHNSON, C. J.   This is a petition brought by Catherine Cosgrove, widow of John F. Cosgrove, late of the city of Central Falls, in the county of Providence, and State of Rhode Island, deceased, Matthew A. Cosgrove, son of said John F. Cosgrove, and Sarah Eliza Howe, granddaughter of said John F. Cosgrove, by her next friend, as heirs-at-law of said John F. Cosgrove, against the respondents, as commissioners appointed for the erection of a bridge between the cities of Pawtucket and Central Falls, for damages to the land of the petitioners caused by the building of certain approaches to said bridge according to plans and specifica-

tions adopted by said commissioners—said commissioners' action in the premises being under the provisions of Chapter 499 of the Public Laws and Chapter 649 of the Public Laws, in amendment thereof, entitled "An Act for the Appointment of a Commission for the Erection of a Certain Bridge between the Cities of Pawtucket and Central Falls."

The petition as filed also prayed for damages for certain land of the petitioners taken in the layout of North Main street in connection with the building of said bridge. Prior to the trial in this case, so much of said petition as related to damages claimed for the land taken was eliminated from the case on the ground that the petitioners had not sought their remedy therefor within the period of time prescribed by the act and, while the petitioners excepted to such ruling and excepted to the ruling of the trial justice declining to receive evidence in support of that part of the petition, the case went to trial before the Superior Court on the question of damages caused by the building of the approaches only.

The case was tried before a justice of the Superior Court and a jury on January 24, 1912. The jury returned a verdict for the petitioners and assessed damages in the sum of $1,100.

The respondents did not move for a new trial before the trial court, but prosecuted direct to the Supreme Court their bill of exceptions.

The case is now before this court on the respondents' exceptions.

There is no record evidence of title to the land in question. Where the land in question now is, formerly the Blackstone river flowed. In the early seventies John F. Cosgrove placed some telegraph posts or piles at this place and proceeded to fill in the land, reclaiming it from the river. Some time later he placed a building upon these piles and continued the work of filling in. On October 26, 1876, and while Cosgrove was in possession, there was placed on record a lease of the premises from Charles Moies to John F. Cosgrove. The period covered by the lease was five years—the rent

fixed was forty dollars per year. The lease contained no covenant of title on the part of Moies; it contained no warranty of quiet enjoyment on the part of Moies. There never was a renewal of this lease.

Charles Moies died in 1880. John F. Cosgrove died May 17, 1910. Cosgrove had been in the quiet, peaceful, and uninterrupted possession of the premises from the time he entered in the early seventies to the time of his death, bearing such burdens as went with the ownership, in the matter of paying taxes, repairing the property, filling in more land, making additions to the building, and according to testimony for petitioners, claiming the premises as his own. The petitioners were in the quiet, peaceful and uninterrupted possession of the premises, and according to testimony for said petitioners claiming them as their own, from the death of their ancestor in title, John F. Cosgrove, until the respondents condemned the same by filing their certificate on the 22d day of October, A. D. 1910.

The petitioners, being unable to agree with the respondents as to their damages, filed their claim in court, and the respondents then, by pleading and evidence sought to impeach the title of these petitioners. There was no formal plea of title set up in behalf of any particular one. The defence simply went to the weakness of the petitioners' title, and not to the strength of an adverse title held by anyone else.

John F. Cosgrove having died in 1910, his first wife, mother of Matthew A. Cosgrove, a petitioner here, having died in 1896, and Charles Moies also having deceased, the original parties' version of the lease of 1876 was unavailable.

At the time of Mr. Charles Moies' death, he left two daughters and, while their age does not appear in the record, one was married to Daniel H. Arnold in 1867, and the other married John C. McMurray in 1872. Mrs. Arnold died about 1895, and Mrs. McMurray is still living. The widow of Charles Moies died in 1884. She collected rent from John F. Cosgrove up to her death, according to the testimony of her

son-in-law, Mr. McMurray.   After the death of Mrs. Moies, Mr. Arnold, the other son-in-law, for a time had something to do with a claim against Mr. Cosgrove.   Mr. McMurray also gave some evidence of having seen him regarding a claim, and that he arranged that Mr. Cosgrove should make payments to Charles P. Moies, a nephew of Charles Moies, deceased.   From this source there came testimony asserting that rent was paid by John F. Cosgrove as late as 1892, and that demands for other rent had been unsuccessful.   Certain evidence, in the form of letters written by John F. Cosgrove to Mr. Arnold acknowledging indebtedness and promising to pay, were introduced in evidence, and a receipt dated as late as 1899 was found upon the premises and introduced in evidence.   None of these letters or this receipt made reference to the matter of rent.   On the other hand, John F. Cosgrove was indebted to Charles Moies for money borrowed, and said Moies held a mortgage at one time upon some other land owned by Cosgrove, which mortgage also covered the house in question.   Mr. Arnold who testified with regard to the letters also said that Cosgrove was behind in his payments upon the mortgage.

(1)    The first exception is to the ruling of the trial justice in refusing to strike out the testimony of witness, Matthew A. Cosgrove, as given in answer to Q. 69, on page 45 of the transcript:   "How was the house damaged by the building of the approaches to that bridge?   A. The house was damaged by the derricks swinging over and knocking down trees and limbs.   The cinders from the smokestack would collect red hot cinders.   You could see them flying in the air about ten feet and they would lodge in a corner of the house.   The Central Falls fire department chief said it was caused by the spark—Objected to by Mr. Bassett.   THE COURT:   Not what the chief said.   MR. BEAGAN:   What happened when the red hot cinders got there?   WITNESS:   They collected. I could see them from my bedroom window and they would form into a corner of the house.   I suppose, to my memory, that the cinders what got there was red hot, what set the

house on fire twice, for the house got on fire in the same place twice." The answer was not responsive to the question. The question did not call for a statement of damage to trees and limbs, but to the house. As to the cinders it does not appear by the answer from what smokestack the cinders came. The statement as to what the Central Falls fire chief said was hearsay. The answer should have been stricken out.

(2) The second exception is to the ruling of the trial justice in refusing to strike out all the testimony of witness, Matthew A. Cosgrove, relating to damage to the property by reason of dynamite explosions during the erection of the approach to the bridge, as such testimony was given in response to Q. 70, on page 47 of the testimony, which said exception appears on page 48 of the transcript of testimony: "Any further damage done to the house as a result of the building of the approaches?" The witness gave an answer that was stricken out and the witness was directed to answer the question. His answer was: "The damage to this house; it knocked all the plaster from the kitchen down on the floor. The jar, I suppose from the dynamite explosion. It didn't break the roof of the house. It broke the windows in the house." Nothing in the answer indicates the source of the dynamite explosion referred to. It may as well have been from other work as any work in connection with the building of the approaches. The answer should have been stricken out.

(3) The third exception was to the ruling of the trial justice in permitting witness, Matthew A. Cosgrove, to answer the question: "Do you know how much land was condemned in eminent domain proceedings?" Land taken by condemnation proceedings could not be included in the land damages caused by the building of the approaches, but it could not injure the respondents to show how much land was condemned. Such land would necessarily be removed from consideration in this proceeding so far as damage to the same was concerned, and to show how much land was condemned would tend to show what remained for consideration as to

damage from the building of the approaches. George A. Carpenter, civil engineer, was permitted to testify as to how much land was taken by the condemnation proceedings without objection. The admission of the question was not error.

(4)   The fourth exception is to the ruling of the trial justice in permitting witness, Matthew A. Cosgrove, to answer Q. 95, page 53 of the transcript of testimony as follows: "Do you know for what purpose he (Martin Santoorjian) uses that portion?" Martin Santoorjian was a tenant of the petitioners. It was immaterial for what purpose he used the land that he rented. Counsel for the petitioners said that they wanted "to show he paid a certain amount of money for rent and by reason of the cutting off of this land the rental value of the property had decreased, diminished." But damages to the property caused by "the cutting off of this land" cannot be considered in this proceeding. The admission of the question was error.

The fifth exception is to the ruling of the trial justice in permitting witness, Matthew A. Cosgrove, to answer Q. 98, pages 55 and 64 of the transcript of testimony, viz.: "Do you know what Mr. Santoorjian paid for rent of those premises prior to the time this land was condemned . . . prior to the building of the approaches?" This question (5) asked for testimony as to the rent paid prior to the time the land was condemned prior to the building of this approach. Damage by reason of the condemnation could not be considered in this proceeding. Its admission was error.

The sixth exception is to the ruling permitting witness, Matthew A. Cosgrove, to answer Q. 105: "I will ask you, Mr. Cosgrove, if you . . . that your father at any time (6) sold any portion of the premises to anybody?"—which said exception appears on page 68 of the transcript of testimony. The deed would have been the best evidence of a sale if any had been made. The admission of the question was error.

(7)   The seventh exception is to the ruling permitting Matthew A. Cosgrove to answer Q. 110: "Is that portion of the land

sold to Frederick E. Shaw by your father included in the premises for which you bring your present action?" While the deed would be the best evidence as to the description of the land conveyed, still it might require the evidence of a witness to show that the portion conveyed was not included in the description of the land in the pending case. If the witness knew we think he might be permitted to answer. The exception is overruled.

(8) The eighth, ninth, eleventh and twelfth exceptions are all taken to rulings permitting questions to real estate dealers as to the value of the land or the house thereon at the time of the trial or after the building of the approach. These questions were properly admitted. It would be necessary to ascertain the present value for the purpose of comparison with the value before the building of the approach. If anything had contributed to a diminution of its value since that time, other than the building of the approach, it could be shown. The exceptions are overruled.

(9) The tenth exception is to the ruling permitting the witness, Charles A. Reynolds, city treasurer and tax collector of Central Falls, to testify, over objection of respondents, to whom the premises were taxed the past twenty years. We do not think that this was prejudicial error. The fact of the assessment to a person would not show title in that person. It would not of itself tend to prove either title or possession. It constitutes simply one circumstance, which in connection with other circumstances shown may be considered by the jury. Thus in *Dickinson* v. *Bales*, 59 Kan. 224, 227, it is said: "It is well settled that the payment of taxes alone does not constitute adverse possession, and is not of itself an evidence of ouster. It is some evidence of ownership, and may be considered in connection with acts asserting dominion and title to the land." See, also, *Draper* v. *Shoot*, 25 Mo. 197. In *Sauers* v. *Giddings*, 90 Mich. 50, 55, evidence that lands were assessed to defendant, was held admissible as tending to show adverse possession, the court saying: "While not of any great value its weight would be for the jury," &c.

In *Murray* v. *Hudson*, 65 Mich. 670, 676, the court said: "We think that payment of taxes by Bryce during his claim of ownership was properly admitted in evidence, and that it has some bearing not only to establish the claim of ownership, but under the circumstances of the occupation, it had a tendency to show adverse possession in Bryce, as it appears that it was assessed to him." The ruling was not erroneous. The exception is overruled.

The thirteenth exception is to the ruling permitting a real estate dealer to answer the question: "What in your opinion would be a fair market value of the house as it now stands?" This question was proper for the same reason as the one which was the subject of the twelfth exception. The exception is overruled.

The fourteenth exception is to the ruling permitting the question: "Were you present, Mr. Briggs, in 1894 upon the Cosgrove premises when Mr. Charles P. Moies came there and asked for rent of Mr. Cosgrove for these premises?" The respondents' counsel contend that there was no evidence that Charles P. Moies was at that time or at any time the agent of the Moies heirs. Daniel H. Arnold testified that he had written authority from his wife and Mrs. McMurray, who were the daughters and heirs of Charles Moies, to collect rent from John F. Cosgrove on the property in question, and that after 1893 Mr. McMurray was attending to that; that Charles P. Moies was perhaps assisting Mr. McMurray. McMurray testified that he talked the matter over with his wife and thought he might be able to make some arrangement with Mr. Cosgrove to get part of the rental and went to Central Falls and saw him. He said he thought Mrs. Arnold was not alive at this time and that he had no recollection of talking it over with any of the Arnolds. He said he gave it no personal attention; that he went to Mr. Cosgrove and made an arrangement with him that he should pay a certain amount to Charles P. Moies. He said that presumably this arrangement existed for a number of years; that when Mr. Moies made his return to him, the return

showed how long that arrangement was, but he had no means of telling what it was. He said that Charles P. Moies accounted to him in 1909 for rent he received, and that Charles P. Moies bought in the property at a tax sale under his direction for the heirs of Charles Moies, deceased. He also identified a receipt for five dollars on account signed "John C. McMurray Agt. by Chas. P. Moies" which the respondents put in evidence. We think there was no error in admitting the question. The exception is overruled.

The fifteenth exception is to the ruling permitting witness, Bessie E. Greene, to state in her answer to question 11, page 555 of the transcript, what she heard Mr. Cosgrove (her uncle) tell her aunt as to what had taken place between himself and Mr. Moies. The witness had just testified to a conversation between Mr. Cosgrove and Mr. Moies in which Mr. Moies said that he wanted to speak to Mr. Cosgrove, and Mr. Cosgrove said: "What do you want to see me for?" Moies said: "I came here to collect the rent," and Cosgrove said: "I don't owe you any rent. I own this place. This property is mine and I won't pay you any." The witness then in answer to the question: "Was anything further said?" was permitted to state what Mr. Cosgrove, five minutes later told his wife, the aunt of the witness, as follows: "He told my aunt that Mr. Moies came there to collect rent and she asked him what he told him or what he done to him. And he said: 'I put him out.'"

The testimony of the witness as to what John F. Cosgrove told his wife five minutes after conversation between him and Charles P. Moies was clearly hearsay. The witness was permitted to testify to what Mr. Cosgrove told his wife as to what occurred between himself and Mr. Moies. Was her testimony in that regard harmful to the respondents? It introduced nothing in addition to the testimony of the witness herself as to the conversation except her statement that Mr. Cosgrove said to his wife, "I put him out." We do not think that this was sufficient to constitute reversible error. The respondents take nothing by this exception.

The sixteenth exception is to the ruling admitting in evidence a "plat showing land in Central Falls condemned October 22nd, 1910, by the commissioners appointed pursuant to the provisions of Chapter 499, as amended by Chapter 649 of the Public Laws of Rhode Island, by George A. Carpenter, Engineer." The admission of this plat was proper. The exception is overruled for the same reason as the third exception.

The seventeenth exception is to the ruling denying defendant's motion for the direction of a verdict for the defendant. On the evidence we think this motion was properly denied. The exception is overruled.

The eighteenth exception is to the following portion of the charge to the jury: "In determining the amount that you will award the claimants in case you find for them, you will ascertain what the difference is in the value of this property between its condition as it stood before the approach was built and its value after the approach was built, and if you find that by reason of the construction of the approach it has deteriorated in value, then the difference between its value before the approach was constructed and its value after the construction of the approach is the amount that you will award to the claimants." We think that in charging the words: "and if you find that by reason of the construction of the approach it has deteriorated in value, then the difference between its value before the approach was constructed and its value after the construction of the approach is the amount that you will award to the claimants," there was error. The value may have deteriorated from causes other than the construction of the approach. If the court had charged "that the difference between its value before the approach was constructed and its value *as deteriorated* by the construction of the approach is the amount that you will award this claimant," we think the instruction would have been correct. As given it was erroneous. The exception is sustained.

The nineteenth and twentieth exceptions are to the refusal respectively of respondents' second and third requests to charge the jury, as follows:

"II.  The claimants cannot recover in this proceeding for any damage to the building occasioned by the commissioners cutting off or removal of the old building from the land condemned by the commissioners.

"III.  The cutting off of the building situate upon the land condemned by the commissioners is no part of the damages incurred by the complainants as abutters by reason of the erection of the approaches upon the land condemned by the commissioners;" and to the modified charge thereon, as follows:

"In respect to those two requests I will say when the commissioners filed their plat in accordance with the provisions of that act under which they took a portion of the land, if they did take a portion of the land belonging to these claimants, on which this building stood, the title to so much as they condemned vested in the State.  The title to so much of the building as rested upon that portion that they condemned also vested in the State, and by a proper proceeding had within the time required by the statute, if the claimants owned the property they would be entitled to recover damages for that portion of the land they took and for that portion of the buildings standing upon the land which they took and they cannot recover in this proceeding for the value of that land, nor for any portion of the building which stood upon that land which was taken, but if, when the commissioners constructed the approach it became necessary to cut the building and by reason of the cutting of the building necessitated by the construction of the approach there was a damage to so much of the building as remained upon the property which abutted upon this approach, then such damage as these claimants here sustained by reason of the damage to the remaining portion of the building would constitute an element of damages."

(13)    Section 4 of Chapter 649 of the Public Laws gives the commissioners power to condemn land, buildings, and improvements for the purposes of the bridge, its abutments, and its approaches, and provides for the appraisal of the damages caused by such condemnation.   Under this section the commissioners condemned a part of the house formerly occupied by the petitioners, and the land on which such part stood.   This petition, so far as it relates to damages caused by the condemnation proceedings is not in issue here.   All that is in issue is such part of the petition as prays for compensation for damages caused to the petitioners as abutting owners through the building of the approaches.   The appraisal of these damages is provided for by Section 5 of Chapter 649, as follows:   "Any person, having an interest in any land abutting upon any part of said approaches, who shall not agree with said commissioners for the damages, sustained by him through the building of said approaches by said commission, may at any time before said approaches are completed by said commission, but not afterwards, have the right to petition to the Superior Court, in the county of Providence, praying for assessment of damages suffered by him through the building of said approaches, and such petition shall be tried and determined in the same manner as is provided in Section 4 of this act for petitions for assessment of damages for the taking of land.   Such petition, if made, shall be in lieu of any proceedings for damages for change of grade."

The petitioners claim that the cutting off of a part of the house they occupied was a part of the damage sustained by them through the building of the approaches.   The cutting off of that portion of the house, however, which stood upon the land condemned by the commissioners was an injury for which they would be compensated under the provisions of Section 4, providing for the appraisal of damages caused by the condemnation proceedings.   The authorities are agreed that where a part of the tract is taken, just compensation includes not only the value of that which is taken, but dam-

ages, if any, to the remainder,—*Taber* v. *N. Y., P. & B. R. R. Co*, 28 R. I. 269, 278. If the contention of the petitioners were correct, the respondents would be liable for damages under the provisions of Section 4, and then liable over again for the same damage under the provisions of Section 5.

The instruction that "if, when the commissioners constructed the approach it became necessary to cut the building and by reason of the cutting of the building necessitated by the construction of the approach there was a damage to so much of the building as remained upon the property which abutted upon this approach, then such damage as these claimants here sustained by reason of the damage to the remaining portion of the building would constitute an element of damages," is erroneous. The exceptions are sustained.

(14)    The twenty-first exception is to the refusal of respondents' sixth request to charge: "VI. In order to claim a title adverse to that of the landlord or his heirs, the tenant must surrender the possession which he holds of the lessor and give the lessor a reasonable time and opportunity to re-take the possession before he can claim adversely." The court charged the jury that: "If John F. Cosgrove at any time after the expiration of the lease executed by Charles Moies in 1876 and under which he occupied the premises by permission of Mr. Moies for five years, disclaimed Mr. Moies' title claiming to be the sole and rightful owner in fee simple of the premises in question and made his claim of ownership in such manner as to carry knowledge of it home to Mr. Moies or to his successors in title, and thereafter continued in uninterrupted quiet and peaceful and actual seisin and possession of said premises for and during the period of ten years after the first day of February, 1896, claiming all that time to be the sole and rightful owner of said premises in fee simple, he acquired title thereto by adverse possession and the claimants as his heirs-at-law are entitled to maintain this proceeding." We think the charge is in accord with the

weight of authority. I Cyc. 1060, 1061 and cases cited. See, also, *Willison* v. *Watkins*, 3 Pet. (U. S.) 43; *Shelton* v. *Eslava*, 6 Ala. 230; *Dothard* v. *Denson*, 72 Ala. 541; *Whipple* v. *Earick*, 93 Ky. 121; *Meridian Land Co.* v. *Ball*, 68 Miss. 135; *Sherman* v. *Champlain Transp. Co.* 31 Vt. 162; *Swann* v. ·*Thayer*, 36 W. Va. 46. The request was properly refused.

The twenty-second exception is to the refusal to charge respondents' seventh request: "VII. The claimants in this case can set off no title adverse to their lessors which is inconsistent with the lessors' right to grant the original lease;" and to the modification thereof, as follows: "I grant that but with this understanding: the claimants at the present time cannot set up that in 1876 when Charles Moies executed that lease that Charles Moies did not have title and authority to execute that lease. The claimants, if they can satisfy you that they are entitled to this property by adverse possession, must show that the possession of their ancestor in title continued a sufficient length of time in the manner which I have already called your attention to, after the expiration of that lease, to entitle them to title by adverse possession, and for a sufficient length of time also after the first day of February, 1896, but they cannot set up now at this time that Charles Moies did not have title in 1876 when he executed the lease, because their ancestor in title recognized the title of Charles Moies and accepted possession of it and occupied under it, and therefore they would be estopped now from setting up at that time Charles Moies did not have title to the property." The instruction given by the court was proper. It did not constitute a refusal of the request, but a granting thereof with proper explanation to the jury. The exception is overruled.

The twenty-third exception is to the refusal of respondents' eleventh request to charge: "XI. It was duty of claimant to take such reasonable action on his part, as by moving his building, as would lessen the damages, by reason of building the approaches, as much as they reasonably could;" and to the modified instruction thereon, as follows: "I think.

gentlemen, that when Mr. Cosgrove had notice that this building must be moved, that he ought not to sit by unnecessarily and see damage done to the building if the conditions were such that he might reasonably be expected to move the building and thus reduce the damage that he otherwise would suffer. There is evidence here, you will recollect, to the effect that the lot was not large enough so that he could move the building back; if he had moved the building back that a portion of it would project over the river. I think the engineer, Mr. Carpenter, testified—somebody testified here—if the building had been moved back on these premises, instead of cutting it that it would have projected over the river some six or seven feet, but you will take into consideration all the circumstances in the case; that Mr. Cosgrove ought not to sit by unnecessarily and see damage done to this property and expect to recover a large sum of money from the commissioners, when the circumstances were such that he might reasonably be expected to move the building back or take some other steps to reduce the damages. It is for you to determine whether or not he should not have taken steps in view of all the circumstances to prevent the cutting of the building. If he ought to have taken steps to prevent the cutting of the building, under the circumstances, then such damage as the claimants have suffered by reason of the cutting of the building would not be an element of damages in this case. With that modification I grant that request." The modification was not erroneous. The exception is overruled.

The jury were properly instructed upon the question of title by adverse possession; and by their verdict found "that the claimants are owners by adverse possession of the property abutting on the approaches of the bridge as set forth in their petition." In our opinion this finding as to title should not be disturbed.

The respondents' first, second, fourth, fifth, sixth, eighteenth, nineteenth and twentieth exceptions are sustained. Respondents' other exceptions are overruled.

The case is remitted to the Superior Court for a new trial upon the question of damages alone.

*John P. Beagan, Thomas L. Carty*, for plaintiffs.

*Edward D. Bassett, Irving Champlin, James Harris*, for respondents.